## Roy Edward GERMAN

### v.

## The UNITED STATES.

### No. 18–79.

United States Court of Claims.

Aug. 13, 1980.

John M. Pinckney III, San Antonio, Tex., for plaintiff. Matthews, Nowlin, MacFarlane & Barrett, San Antonio, Tex., of counsel.

---

Colvin W. Grannum, Trial Atty., Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant; LeRoy Southmayd, Jr., Washington, D. C., and Lt. Comdr. Eric J. Barnett, Dept. of the Navy, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, SKELTON, Senior Judge, and KUNZIG, Judge.

## ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

 The principal issue in this case, here on the plaintiff's motion for partial summary judgment and the defendant's cross–motion for summary judgment, is whether the Navy properly terminated an agreement for the payment of a bonus to a medical officer, given in return for his commitment to remain on active duty for 2 years, on the ground that the officer's professional performance had deteriorated prior to the execution of the bonus agreement. On the basis of the briefs and after hearing oral argument, we hold that the termination was improper.

### I.

Facing a shortage of doctors in the uniformed services several years ago, Congress established a variable incentive pay program to encourage medical personnel to stay in the service. 37 U.S.C. § 313 (1976). The program authorizes the armed services to pay amounts of up to $13,500 per year (in addition to regular salaries) to medical officers with critical specialties who agree to remain on active duty for a specified number of years.

A Variable Incentive Pay Selection Board was convened on August 28, 1974, to consider eligible Navy doctors. The Board concluded that plaintiff, a captain who was a specialist in the critical fields of obstetrics and gynecology, was qualified for the program, and selected him. On September 20, 1974, plaintiff entered into a variable incentive pay agreement under which he agreed to remain on active duty in the United States Navy for 2 years, and the Navy agreed to pay him, in addition to his regular salary, $22,600 in two annual installments of $11,300. Plaintiff received the first annual installment.

A second Variable Incentive Pay Selection Board was convened on February 24, 1975. This panel was to consider doctors eligible for the program and to reconsider all officers previously selected. This second Board, in reviewing plaintiff's record, had before it a fitness report that had not been available to the panel which had selected him for variable incentive pay. The report covered his service prior to his selection for the program, namely, from October 7, 1973 to August 7, 1974. The report placed plaintiff in the lower half of the category termed "Typically Effective Officer." The rating officer also included derogatory comments about plaintiff's performance.

On the basis of this information the Board concluded that plaintiff should no longer remain in the program. The Board decided that plaintiff's variable incentive pay would terminate after the first year of his agreement ended on September 19, 1975, and so informed him. In March 1976, plaintiff, who then had served in the Navy for 20 years, requested voluntary retirement. Plaintiff retired as a captain at the end of July 1976.

The plaintiff contends that the Navy breached its variable incentive pay agreement with him by terminating his participation in the program on the basis of his pre–agreement performance of duty. He seeks damages of (1) the $11,300 he would have received for the second year of the variable incentive pay agreement, and (2) the approximately $15,000 he allegedly expended in efforts to obtain similar employment after the variable incentive pay agreement was terminated. Plaintiff seeks summary judgment only on the issue of liability, namely, the propriety of the Navy's termination of his variable incentive pay agreement. Defendant, however, in its

cross–motion, seeks summary judgment on both issues.

## II.

A. The statute provides that eligible medical officers who are "qualified in a critical specialty" and "determined ... to be qualified to enter into an active duty agreement for a specified number of years," and who sign "a written active duty agreement" covering a specific number of years "may, upon acceptance of the written agreement by the Secretary concerned, or his designee, and in addition to any other pay or allowances to which he is entitled, be paid an amount not to exceed $13,500 for each year of the active duty agreement." 37 U.S.C. § 313(a).

The statute also provides:

(b) Under regulations prescribed by the Secretary of Defense, the Secretary concerned, or his designee, may terminate, at any time, an officer's entitlement to the special pay authorized by this section. In that event, the officer is entitled to be paid only for the fractional part of the period of active duty that he served and he may be required to refund any amount he received in excess of that entitlement.

The Secretary of Defense promulgated a regulation which authorizes the Secretaries of the armed services to

terminate a medical officer's entitlement to variable incentive pay, at any time, upon a determination by a board composed of medical officers, that the officer's performance has deteriorated to a level at which no premium should be placed on his continued service. In the event of such termination of entitlement, the officer shall be entitled to be paid only for the proportionate part of the period of active duty that he served under the agreement and he shall refund any amount he received in excess of that entitlement.

Department of Defense, Directive No. 1340.11 para. III.K (1974). The Navy used almost identical language in its own instructions concerning termination of naval officers in the program. Department of the Navy, SECNAV Instruction No. 7220.75.8 (1974).

B. The legal issue here is whether the words "the officer's performance has deteriorated" cover deterioration before as well as after the variable incentive pay agreement had been entered into. We conclude that the regulation permits termination only for deterioration that occurs after the agreement and does not authorize the Navy to do what it did here: terminate on the basis of deterioration of performance that antedated the agreement but of which the Variable Incentive Pay Selection Board did not learn until after the agreement was executed. Cf. *Harmon v. Brucker*, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958); *Murray v. United States*, 154 Ct.Cl. 185 (1961).

The statute provides for variable incentive pay for medical officers who are "qualified to enter into an active duty agreement for a specified number of years." The regulation provides that an officer's "entitlement to variable incentive pay" may be terminated at any time upon a determination that the officer's "performance has deteriorated to a level at which no premiums should be placed on his continued service." The regulation addresses the situation where there has been a change in circumstances since the active duty agreement was executed, namely, that an officer originally qualified for premium pay is no longer so qualified because his "performance has deteriorated to a level at which no premium should be placed on his continued service." The time reference of the words "has deteriorated" is to the period since the active duty agreement was executed, not to deterioration since some more remote time.

This conclusion comports with the fact that to participate in the program the officer must "execute ... a written active duty agreement" which the Secretary then accepts. Although the government asserts that this written agreement was not a contract, this argument is a mere play on words. An agreement is a contract, and vice versa. The Navy itself so characteriz-

ed its agreement with the plaintiff when it informed him on April 28, 1975, that his "variable incentive pay contract" would be cancelled on September 19, 1975. This court has described an active duty agreement as "an agreement or contract between the officer and the Navy that provides for his service in the Navy for not less than one nor more than five years (as agreed upon)." *Henneberger v. United States*, 187 Ct.Cl. 265, 268, 407 F.2d 1340, 1341 (1969).

Once the Navy has entered into a variable incentive pay contract for a specified number of years, general principles of contract law require the Navy to perform that agreement. The situation the regulation addresses, which would justify the Navy's terminating the agreement, is a change in conditions that would make continued performance of the agreement inconsistent with the program the agreement was designed to implement: the fact that because of subsequent deterioration of the officer's performance, it is no longer appropriate to pay the officer a premium for his continued service. That this is the purpose of this provision is confirmed by the further provision in the regulation that, upon such termination, "the officer shall be entitled to be paid only for the proportionate part of the period of active duty that he served under the agreement, and he shall refund any amount he received in excess of that entitlement." This rather stringent provision, requiring the officer to refund portions of the variable incentive pay already received, suggests that the termination provision was directed to changes in circumstances after the agreement was effective.

The government argues, however, that because of the procedures governing the preparation of naval officer fitness reports, there was no way in which the Variable Incentive Pay Selection Board that selected plaintiff for the program in August 1974 could have considered plaintiff's fitness report for the period immediately preceding the Board's action (October 7, 1973 to August 7, 1974). It points out that that report had not yet been prepared when the Board acted and did not become a part of the plaintiff's personnel records until February 21, 1975.

These facts do not justify the Navy's action. When the Variable Incentive Pay Selection Board selected the plaintiff, necessarily it must have determined that he was qualified for the program. If the Board then had not had sufficient information upon which to base that determination, it could have delayed evaluating the plaintiff until it had that information. It could have awaited the officer's latest fitness report or, alternatively, it could have requested an expedited special fitness report. Since the government tells us that only 233 naval officers were found qualified for variable incentive pay from 1974 through 1979, an interim reporting system on officers tentatively selected for the program would not have seriously burdened the Navy.

### III.

We dismiss the portion of the plaintiff's petition that requests damages covering his expenses in seeking other employment.

■ The termination of plaintiff's variable incentive pay agreement did not require him to leave the Navy. He could have continued on active duty with his regular pay but without the incentive premium pay. The plaintiff's decision to retire after the Navy terminated his variable incentive pay agreement was voluntary. Whatever expenses plaintiff incurred in seeking other employment were attributable to his own decision to retire, not to the government's action in improperly terminating the variable incentive pay agreement.

### CONCLUSION

The plaintiff's motion for partial summary judgment is granted. The government's motion for summary judgment is granted with respect to the claim for plaintiff's expenses in seeking other employment and denied in all other respects. The plaintiff is entitled to recover $11,300 and judgment is entered for plaintiff accordingly.